

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00029-CR

_____

Ex parte Zachary Dixon Parker

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CV23-0098

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant Zachary Dixon Parker stands charged with two counts of first-degree theft of property, and his bail was set at $1,500,000 on each charge. Parker applied for habeas relief with the trial court, requesting that bail be reduced to $50,000 per charge. After a hearing on the habeas application, the trial court denied his request and Parker appealed. We will affirm.

## I. BACKGROUND

Parker's charges stem from a contract that he entered into to construct a multi-million-dollar RV park in Parker County, Texas. According to the probable cause affidavits that were signed by sheriff's deputy Matthew Scurry, in July and November 2021, Parker accepted two payments—of $1,722,600 and $987,000 respectively—from the RV park owner to complete portions of this project. Scurry alleged that this money was not used for the project even though bank statements showed that the money had been depleted from Parker's accounts. He alleged that Parker instead used large sums of this money to purchase personal items such as jewelry, art, food, and animals and to complete projects for other clients. Further, he attested that Parker used the money to purchase multiple pieces of heavy machinery totaling approximately $500,000. According to Scurry, Parker's residence in Pilot Point, Texas, had been listed for sale in December 2022 for $2,999,900. Based on this, Scurry attested that Parker owns three to four million dollars in liquid assets

which "creates a substantial concern of flight post arrest," thus justifying "a greater than standard bond amount" for Parker.

At the hearing, Parker's wife, April Hahnfeld, testified that she had been married to Parker for about a year and a half. They live together in a home in Benbrook, Texas, with three children. Hahnfeld testified that neither she nor Parker have any equity interest in the Benbrook home; rather, it is an "investment" property owned by the Parker Family Trust, of which Parker's father is the sole beneficiary. Concerning the home in Pilot Point, Texas—alluded to in the probable cause affidavit—Hahnfeld stated that it was sold by the trust to a third party in 2021 and that they have not lived there since.

According to Hahnfeld, Parker's parents live in east Texas and he leases business space in Fort Worth. Parker's construction business employs about thirty people, is currently completing a number of large development projects in the area, and is slated to begin several more in the near future. Hahnfeld stated that this business owns "a lot of" equipment located on "a lot of job sites," but that none of it can be sold for cash because it is all "encumbered under liens or a receivership."[1]

When questioned about Parker's other business ventures, Hahnfeld confirmed that Parker was a stakeholder in at least six businesses—many of them in partnership

---

[1] Hahnfeld confirmed that there was an active "personal receivership" that "has control over any monies that come into" Parker's possession, but she could not testify specifically about the litigation and judgments underlying the receivership.

with Parker's father. One of these—a sand and gravel business—was purchased by Parker in 2021 for $1,700,000. When asked how familiar she was with Parker's business transactions, Hahnfeld stated "not very . . . I don't know how things are structured. I don't know how things are registered. I don't know any of that." She did agree, though, that Parker would generally have some control over and interest in the financials of those businesses and that a full accounting of those businesses would be impossible without him.

Though Hahnfeld testified that she does not work outside of the home, she said that she performs "business development" for one of her husband's LLCs. She said that she is paid for this work but did not know how much and was unsure whether the payroll was paid weekly or biweekly. Hahnfeld has a personal investment account valued at about $60,000 and an estimated $13,000 in cash at her disposal.

She testified that Parker owns a condo that has multiple encumbrances and for which he would realize no profits if it was sold. Further, she and Parker own royalty interests in a water pipeline that pays them between $10,000 and $15,000 per month. They use this money to pay for their everyday expenses. She did not know if Parker had any additional personal bank accounts. To Hahnfeld's knowledge, Parker has never been convicted of a crime or been placed on a probated or suspended sentence. She had recently surrendered his passport to the adult probation office.

Deputy Scurry testified that the Pilot Point home was of concern to him when completing the probable cause affidavits because that home was and continued to be

4

the address used by Parker's various businesses and was the address listed on Parker's driver's license. Scurry relied on this information when he attested in the probable cause affidavits that Parker owned the home and did not investigate the property records to confirm this assertion. Scurry testified that, concerning his investigation into Parker's assets, it was difficult to ascertain ownership because "it's all done under an LLC" rather than under Parker's name.

According to Scurry, while investigating the claims against Parker he discovered a number of pieces of heavy machinery in the possession of Parker's LLCs. He estimated that the fair market value of this equipment was approximately $1,300,000. He refuted Hahnfeld's testimony that all of this equipment was encumbered by liens; he had been able to confirm with certain sellers that at least some of the equipment—totaling about $475,000—was purchased outright without financing. And some of this equipment was purchased specifically using the money paid to Parker from the RV park owner that was supposed to be used for the RV park project.

Parker requested his bail amounts be reduced to $50,000 apiece, arguing that his close personal and business ties to the community, lack of prior criminal history, and lack of assets not encumbered by liens or the receivership weighed in his favor. The State opposed the reduced bail, arguing that Parker had taken $3,500,000 from the RV park owner but could not account for a large portion of that money. The State also pointed to the large amounts of expensive equipment owned by Parker's LLCs and the fact that virtually all of Parker's assets were hidden behind the veil of

5

these LLCs—which Hahnfeld admittedly knew nothing about nor could account for. This, said the State, weighed heavily in favor of keeping the bonds at their current amounts.

The trial court denied Parker's request for habeas relief, and Parker appealed this order.

## II. DISCUSSION

We review a trial court's pretrial bail determinations for an abuse of discretion. *Ex parte Hunt*, 138 S.W.3d 503, 505 (Tex. App.—Fort Worth 2004, pet. ref'd). A trial court abuses its discretion if it acts without reference to any guiding principles or, in other words, if the action was arbitrary, unreasonable, or outside the zone of reasonable disagreement. *Id*; *see Ex parte Carter*, 621 S.W.3d 355, 358 (Tex. App.—San Antonio 2021, no pet.). "Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Hunt*, 138 S.W.3d at 505.

The primary purpose of bail is to secure a defendant's appearance at trial. *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977); *see Ex parte Rubac*, 611 S.W.2d 848, 849 (Tex. Crim. App. [Panel Op.] 1981). The bail amount should be sufficient to give reasonable assurance of his appearance, but it should not be used as an instrument of oppression. Tex. Code Crim. Proc. Ann. art. 17.15(a)(1)–(2); *Hunt*, 138 S.W.3d at 505. It is the appellant's burden to demonstrate that the bail set by the

6

trial court is excessive. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. 1980).

Courts determine reasonable bail under the specific circumstances of the case and must consider: the nature of the offense and potential length of the sentence, including any aggravating factors; the defendant's work history, family ties, and length of residence; the defendant's ability to post the bond; any prior criminal record; conformity with past bond conditions; and the future safety of the alleged victim and the community. Tex. Code Crim. Proc. Ann. art. 17.15(a)(1)–(6); *Hunt*, 138 S.W.3d at 506 (citing *Rubac*, 611 S.W.2d at 849–50).

## A. NATURE OF THE OFFENSE AND POTENTIAL LENGTH OF SENTENCE

Parker is charged with two felony counts of first-degree theft. The potential length of sentence for a first-degree felony in Texas is ninety-nine years or life in prison. Tex. Penal Code Ann. § 12.32(a). While the nonviolent nature of a theft offense can be favorable to a bond reduction, *see In re Traylor*, Nos. 01-98-01376-CR, 01-99-00012-CR, 1999 WL 497424, at *4 (Tex. App.—Houston [1st Dist.] July 8, 1999, no pet.) (not designated for publication), the severity of punishment for a first-degree felony can weigh heavily against it, *see Ex parte Temple*, 595 S.W.3d 825, 829 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (noting that "the pretrial bail must be set sufficiently high to secure the presence of the accused at trial because the accused's reaction to the prospect of a lengthy sentence might be to flee and fail to appear").

Thus, the potential length of sentences for Parker's charged offenses provided the trial court with a reasonable basis upon which to deny Parker's request for bail reduction. *See Rubac*, 611 S.W.2d at 849 ("The *primary* factors [in determining bail] are the length of sentence and the nature of the offense.") (emphasis added) (internal citations omitted).

## B. TIES TO THE COMMUNITY

It was undisputed that Parker had strong personal and business ties to the community. His wife and children live in the area and his parents live in east Texas. Further, he has established businesses here.

## C. ABILITY TO POST BOND

The inability of an accused to make bail does not alone control in determining his bail amount. *Hunt*, 138 S.W.3d at 506. "If the ability to make bond in a specified amount controlled, then the role of the trial court in setting bond would be completely eliminated, and the accused would be in the position to determine what his bond should be." *Id.* Here, Hahnfeld testified that she and Parker had only $13,000 at their disposal with which to pay his bail and that they had no ownership interest in either the Benbrook or Pilot Point homes. She also testified that they are paid between $10,000 and $15,000 per month from royalty interests in a water pipeline and that Parker owns a condo encumbered by a loan.

Notably, Parker is accused of stealing potentially millions of dollars from the alleged victim and using that money to purchase various items of personal property.

And much of this money is still unaccounted for. Further evidence established that Parker is a stakeholder in numerous LLCs that own valuable equipment. But not even Hahnfeld could testify with any clarity concerning the financial accounting of those LLCs, what assets they owned, or whether Parker had any unknown bank accounts.

Thus—though Hahnfeld sought to establish an inability to pay Parker's bail—the obscurity of Parker's assets and ownership interests in the LLCs; his royalty income and condo ownership; and the high-dollar amounts allegedly stolen could have provided a reasonable basis for the trial court to believe that Parker may have been capable of paying the bail amounts. As the factfinder, the trial court was free to believe or disbelieve any part of Hahnfeld's testimony. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) ("[The trial court] is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because [it] has the opportunity to observe the witness's demeanor and appearance.")

### D. PRIOR CRIMINAL AND BOND HISTORY

There was no evidence that Parker had any prior criminal history or that he had been placed on bond before.

### E. FUTURE SAFETY OF THE ALLEGED VICTIM AND THE COMMUNITY

As stated above, theft is a nonviolent crime and does not inherently raise any concerns related to the physical safety of the alleged victim or community. *See Traylor,*

9

1999 WL 497424, at *4. A trial court's concern, however, is not only about physical violence because it is undoubtedly reasonable to also fear for the community's financial safety. *See Ex parte Castellanos*, 420 S.W.3d 878, 884 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The theft of credit card numbers and impact on the victims cannot be ignored in analyzing the safety of the community relevant to bail determinations."). Hahnfeld testified at the hearing that Parker had both ongoing and upcoming lucrative construction projects. She also stated that only Parker could provide a full-accounting of his business interests.

Based on this and given Parker's alleged history of theft from a client, it would be reasonable for the trial court to be concerned for the safety of the community— namely Parker's current and future clients—if he had access to the business accounts and large payments related to these projects.

### III. CONCLUSION

In sum, the length of Parker's sentence, questions about his ability to pay bail, and concerns for the community's safety all provided a reasonable basis for the trial court to deny his request for bail reduction. Accordingly, we hold that the trial court did not abuse its discretion and affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  April 13, 2023